213 So.2d 919

Floyd Alexander CALDWELL

v.

STATE.

6 Div. 470.

Supreme Court of Alabama.

Aug. 15, 1968.

Rehearing Denied Sept. 26, 1968.

St. John & St. John, Finis E. St. John, Jr., Finis E. St. John, III and George L. Beck, Jr., Cullman, for appellant.

MacDonald Gallion, Atty. Gen., and Lloyd G. Hart, Asst. Atty. Gen., for the State.

HARWOOD, Justice.

Under an indictment charging murder in the first degree a jury found this appellant guilty of murder in the second degree and fixed his punishment at confinement in the penitentiary for thirty years. Judgment was entered pursuant to the verdict, and appellant's motion for a new trial being overruled, he perfected this appeal from the judgment of conviction and the judgment on the motion for a new trial.

The evidence tends to show that the appellant has a parked trailer on Smith Lake in Cullman County, and often spent weekends at the lake. He has a pistol range at his place which is used by him and his neighbors.

The appellant went to his trailer on 12 November 1966, which was a Saturday. Sunday morning he prepared breakfast and drank some vodka he had brought with him.

The appellant then went to the home of Other Handley, from whom he had purchased whiskey on two prior occasions, to obtain some whiskey. Handley had no whiskey for sale, but offered appellant a drink of corn whiskey from a bottle he had on his person. Handley and appellant

had a drink or drinks and Handley told appellant where he might buy some whiskey.

Appellant suggested that Handley go with him and Handley agreed to do so, but asked if he could take his girl friend along. The appellant assented to this arrangement and the appellant, Handley, and Marie Davis Smith got into appellant's truck and drove off. Marie Davis Smith wound up on a rural trash dump with a fatal bullet wound in her chest.

She had arrived at Handley's residence the previous morning, and had been drinking prior to her arrival. She and Handley entered upon a drinking spree interlaced with episodes of sexual intercourse, and trips to obtain more alcoholic beverages.

The appellant, Mrs. Smith, and Handley, made a circuitous drive through the southern portion of Cullman County before locating a whiskey seller. Eventually they obtained a gallon jug of corn whiskey. They then drove haphazardly along rural roads, making several stops, when they would pour the whiskey from the gallon jug into a pint bottle and therefrom continue their drinking. Eventually they arrived at the trash pile on a rural road where Mrs. Smith was killed.

Here they parked and took more drinks. Contradictory accounts as to what occurred thereafter were recounted to the jury by Handley and by the appellant.

In the trial below Handley testified that at the scene of the shooting he was attempting to have sexual intercourse with the deceased. The appellant was standing at the rear of the truck. The appellant came from the rear of the truck and ordered Handley to go to the back of the truck, and the appellant then began "fooling with" the deceased. The appellant then pulled a pistol from his left pocket, and Handley began walking down the road. When he had walked eight or ten feet down the road, the appellant told Handley to "hold it." Handley stopped, and as he turned about halfway around he heard a gun fire and saw the deceased's head fall. Handley then jumped into the woods on the side of the road and ran.

Handley ran through woods and fields and came to a house where he used a telephone to call the sheriff's office and report the incident.

According to several witnesses, including Deputy Sheriff Easterwood, and Sheriff Waldrop, Handley's account as to what had occurred was to the effect that when he walked down the road and had stopped at appellant's command to "hold it," the appellant fired his pistol at him twice, the second time as he was running through the woods, and that as he was running after the second shot, he heard a third shot. Looking quickly back he saw deceased fall from the truck. Handley gave a written statement to law officers in accord with this first version, and this statement was received in evidence when offered by the state. Handley had also testified in a previous hearing of same nature in accord with his first version.

The evidence is uncontradicted that only one shot was fired from the pistol owned by the appellant.

When confronted with the variation between his testimony at the trial, and his prior statements and testimony, Handley's responses were evasive and equivocal and, at one time, he testified that his prior statements were "no good" since he did not have a lawyer present when he made them.

The appellant's testimony as to what happened at the scene of the shooting was to the effect that while Handley was attempting to have intercourse with the deceased, she protested appellant's presence, and at Handley's request, he walked down the road. He then sat down and went to sleep. He was awakened by "something," he did not know what, and walked back to the truck. Here he saw Mrs. Smith lying in the truck and Handley near the truck. He tried to raise Mrs. Smith up and she fell out of the truck onto the ground. As

he had been trying to get away from Handley and Mrs. Smith for some time, he got in his truck and drove back to his trailer.

When the officers, guided by Handley, arrived at the scene they found Mrs. Smith on the ground with a bullet wound in her chest. She was dead.

Deputy Easterwood dispatched two officers to pick up the appellant. He was found at his trailer camp asleep on the seat of his truck. The appellant was handcuffed and placed in the officer's automobile. A 38 calibre pistol in a scabbard was found on the seat of appellant's truck. It had been fired one time. Ballistic tests showed that the bullet that killed Mrs. Smith was fired from this pistol.

Appellant was highly intoxicated. The officers then drove back to the scene with the appellant.

Counsel argues that error to reversal resulted from the court's action permitting, over appellant's objections, certain accusatory statements addressed by the witness Handley to the appellant when he was brought back to the scene of the shooting after the officers had taken him in custody at his trailer, and appellant's failure to reply thereto. This testimony was elicited through the witness Handley, state trooper Shafer, and Sheriff Waldrop.

The evidence shows that at the time the appellant was taken into custody at his trailer, he was either asleep or "passed out," or as one officer stated, probably both. The appellant remained in the officer's automobile at the scene of the shooting, and the evidence is clear that he was quite intoxicated. The evidence further shows that Handley was "nervous and crying" at the scene, and was intoxicated.

It appears that Handley was taken to the automobile in which the appellant was seated for the purpose of identifying the appellant.

Handley testified he approached within a foot or a foot and a half of the automobile. He did not know whether the windows were up or down. Handley testified that at this time, "I said, why did you shoot her?" Handley was then asked, "Did he see you?" In answer to the question Handley replied, "I guess he did."

At this time appellant's counsel interposed a general objection, with no grounds assigned. It does not appear that the court ruled on the objection. Handley then testified that the appellant did not reply to his question but "dropped his head down."

Trooper Shafer's testimony is to the same effect, except that the record shows the following during the direct examination of Shafer:

"Q. Did you hear Other Handley say anything to Caldwell?

"A. Yes, sir.

"Q. What did he say?

"Mr. St. John III: We object to that.

"The Court: Overruled.

"Mr. St. John III: We except.

"A. He said, 'Why did you kill her?' "

Shafer further testified that the appellant did not reply, but "dropped his head."

No error can be posited on these instances, in that the court did not rule as to the objection during Handley's examination, and in both instances only a general objection was interposed. There had been no testimony at the time Handley and Shafer testified as above as to the intoxicated condition of both Handley and the appellant. In this aspect the evidence may not have been obnoxious to all rules of evidence, whereas it would have been if the intoxicated conditions of Handley and the appellant had been shown at the time of the conversation.

A different picture is presented by the time Sheriff Waldrop testified in that the evidence had shown that both Handley and the appellant were intoxicated at the time Handley made his statement to the defendant. During the examination of Sheriff Waldrop, he testified that he had

asked Handley to go to the automobile to identify the appellant. The record then shows the following:

"Q. What tone of voice did Manzie Handley use when he talked to the defendant?

"A. He walked up and stuck his head in the window and looked straight toward Mr. Caldwell with his shoulders stuck inside and said, 'Why did you shoot her?' And I reach up and grabbed him and told him I didn't ask him to have a conversation with him."

Following the above answer by the Sheriff, counsel interposed an objection, and also moved to exclude it. This motion was overruled.

◼ The general rule is that where no grounds are assigned in support of motion to exclude, no error results in denying the motion. Alabama Securities Company v. Dewey, 156 Ala. 530, 47 So. 55; Southern Electric Generating Company v. Lance, 269 Ala. 25, 110 So.2d 627. However, it is the rule that a general objection to a question calling for evidence which is obnoxious to all rules of evidence, and cannot be made admissible by reframing the question or additional testimony, a general objection is sufficient. Shores v. Sanders, 271 Ala. 552, 126 So.2d 201; Helms v. State, 34 Ala.App. 82, 37 So.2d 229; Downey v. State, 115 Ala. 108, 22 So. 479.

◼ By analogy we think the same rule should apply to motions to exclude an answer, that is, that a general motion to exclude without specifying grounds should be considered sufficient if the answer is unresponsive and obnoxious to all rules of evidence.

◼ At the time the Sheriff made his unresponsive answer to the question, the evidence shows per adventure that the situation, in every day language, was that of one drunk leveling a charge against another who was even more drunk. Un-

der Sheriff Waldrop's answer there actually was no opportunity for the appellant to have replied to Handley even if the appellant had been in a state of sobriety to the extent that he could have made an answer. There could be no doubt but that Sheriff Waldrop's unresponsive answer to the question addressed to him was prejudicial to the appellant. We hold therefore that the court erred in denying appellant's motion to exclude Sheriff Waldrop's answer.

In Bob v. State, 32 Ala. 560, this court wrote:

"The implication of admissions from silence rests upon the idea of acquiescence. The maxim is, 'qui tacet, consentire videtur;' and it never applies, unless an aquiescence in what is said can be presumed. Neither reason nor law will permit the presumption of acquiescence to be drawn from the silence, unless the circumstances were not only such as afforded the party an opportunity to act or speak, but such also as would properly and naturally call for some action or reply from men similarly situated."

To the same effect see Rowland v. State, 14 Ala.App. 17, 70 So. 953; Moore v. State, 261 Ala. 578, 75 So.2d 135.

◼ Thus it has always been the doctrine of our cases that a defendant must have heard and understood and had an opportunity to deny an accusatory statement, under circumstances calling for a reply, before any tacit admission emanating from his silence can be used against the accused.

In Robinson v. Morrison, 272 Ala. 552, 133 So.2d 230, it was observed as to the tacit admission rule:

"Four Wigmore on Evidence, 3rd Edition, § 1071, p. 70, says that the rule grew up that anything said in a party's presence was receivable against him as an admission, and that the effort of the courts was to dislodge the absolutism of the rule. He concludes with the follow-

ing statement, quoted with approval in Kennedy v. State, [39 Ala.App. 676, 107 So.2d 913,] supra:

'* * * It would seem to be better to rule at least that any statement made in the party's presence and hearing is receivable, *unless* he can show that he lacked either the opportunity or the motive to deny its correctness; thus placing upon the opponent of the evidence the burden of showing to the judge its impropriety. *But the burden is in practice generally left upon the proponent to show that the requisite conditions existed*; * * *'

citing inter alia Raymond v. State, 154 Ala. 1, 45 So. 895. (Emphasis supplied.)

"We agree with the correctness of the italicized statement, and approve of it in principle. Evidence of this variety is, at best, of doubtful value. The likelihood of a protestation is always balanced against the urge to avoid a fruitless disputation or the determination to refuse the accusation the credence of a reply. * * *"

In the present case the facts shown by the state prior to Sheriff Waldrop's testimony in itself established the inadmissibility of the evidence shown by the Sheriff's answer, because of the intoxication of the two participants in the conversation.

We hold therefore that under the decisions of this court the lower court erred in denying appellant's motion to exclude the answer of Sheriff Waldrop under the developed facts of this case.

We wish to note further, particularly for for the benefit of the prosecution officers, that serious doubt has been cast upon validity of the use of tacit admissions in criminal cases by recent United States Supreme Court cases.

The tacit admission rule has during the years been accepted by every court, state and federal, with few exceptions. It has not been free from pungent criticism, however, and one of the most perceptive criticisms

of the rule is to be found in the dissenting opinion of the then Chief Justice Maxey of the Supreme Court of Pennsylvania in Commonwealth v. Vallone, 347 Pa. 419, 32 A.2d 889. Therein are collated those decisions which have repudiated the tacit admission rule. Obviously, the Pennsylvania court did not accept Chief Justice Maxey's views at that time, but continued the tacit admission rule in effect.

This question was again before the Pennsylvania court in 1967 in Commonwealth v. Dravecz, 424 Pa. 582, 227 A.2d 904. The Supreme Court of Pennsylvania at this time repudiated the tacit admission rule in toto, not only because the court considered the rule to be based on a specious foundation, but also because that court concluded that recent decisions of the United States Supreme Court compelled its repudiation.

In the course of the majority opinion (Chief Justice Bell dissented) the court wrote:

"This rule, which has become known as the tacit admission rule, is too broad, wide-sweeping, and elusive for precise interpretation, particularly where a man's liberty and his good name are at stake. Who determines whether a statement is one which 'naturally' calls for a denial? What is natural for one person may not be natural for another. There are persons possessed of such dignity and pride that they would treat with silent contempt a dishonest accusation. Are they to be punished for refusing to dignify with a denial what they regard as wholly false and reprehensible?

"The untenability of the tacit admission rule is illustrated in the following startling proposition. A defendant is not required to deny any accusation levelled at him in a trial no matter how inculpatory. He may be charged with the most serious of offenses, including murder and high treason. A cloud of witnesses may testify to circumstances, events, episodes which wrap him in a serpent's embrace of incrimination, but

no inference of guilt may be drawn from his failure to reply or to take the witness stand. Indeed, and properly so, if the prosecuting attorney or the judge makes the slightest reference to the fact that the accused failed to reply to the accusations ringing against him, and a verdict of guilt follows, a new trial is imperative. And yet, under the *Vallone* holding, an accusatory statement made in any place chosen by the accuser, whether on the street, in the fields, in an alley or a dive, if unreplied to, may be used as an engine in court to send the defendant to prison or to the electric chair.

"How so incongruous a doctrine ever gained solemn authoritativeness might well be a subject for a long article in a law review. Especially when one reflects on the fact that the rule is founded on a wholly false premise.

* * * * * * * *

"* * * It rests on the spongey maxim, so many times proved unrealistic, that silence gives consent. Maxims, proverbs and axioms, despite the attractive verbal packages in which they are presented to the public, do not necessarily represent universal truth.

* * * * * * *

"Under the tacit admission rule, if a suspect is taken to the scene of the crime where people have gathered, mouthing all sorts of rumors and suppositions against him, it becomes his duty to single out every scandalmonger, every irresponsible gossip bearer, every loose-tongued hanger-on and reply to their accusations. Otherwise, their inflammatory, unsworn reproaches and denouncements may become formal swords of indictment. This is not rule by reason but by unrestrained babblement.

* * * * * * *

"The New York Court of Appeals observed in People v. Page, 162 N.Y. 272, 56 N.E. 750:

'It cannot be that there is any such anomaly in the criminal law as is involved in the proposition that an accused person, when charged with the offense in open court by indictment, may stand mute without prejudice to his innocence, while the same person is bound to deny neighborhood gossip with respect to his guilt at the peril of furnishing by silence evidence against himself when on trial upon the charge.'

"The decisions of the Supreme Court of the United States in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed. 653; Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, have, in effect, shattered the tacit admission rule as pronounced in *Vallone*. Whatever may be left of the rule after the enfilading fire of the Supreme Court is here overruled."

We are not sure that we are in accord with all that was written in *Dravecz,* supra, and do not wish to be understood as repudiating the tacit admission rule or overruling our cases pronouncing that doctrine. We do wish, however, to call attention to the fact that one able court has concluded that the named United States Supreme Court decisions have "shattered" the tacit admission rule. Certainly, this conclusion is not without support. However, the tenuous statements in the federal decisions leave doubt as to the true doctrines enunciated in certain aspects, particularly as to whether they apply to tacit admissions by silence when not the result of police accusations as distinguished from accusations by non-official parties.

Counsel for appellant has also argued that error flowed from the action of the District Attorney in cross examining the appellant while using a transcription prepared from a dictation to a secretary by Sheriff Waldrop the day following the Sheriff's interview of the appellant. Appel-

lant counsel objected to the District Attorney using the transcript. This transcription was never read to nor seen nor acknowledged to be true by the appellant. The transcription was not offered in evidence.

Counsel for appellant contends that this conduct by the District Attorney was within the influence of Bennefield v. State, 281 Ala. 283, 202 So.2d 55. We do not agree.

In *Benefield*, supra, the transcription had never been presented or read to the accused, nor acknowledged by him. The secretary who prepared the transcription was not called as a witness and the authenticity of the transcription was affirmed only by the officer who had dictated the same. Over appellant's objection, the transcription was received in evidence. This procedure was held to be error to reversal.

In Parker v. State, 266 Ala. 63, 94 So.2d 209, a situation almost identical to that presented in the present case was considered. This court wrote:

"The solicitor merely used the paper to refresh his own memory when propounding questions to the defendant on cross-examination. In other words, the character of the paper was nothing more than private notes of the solicitor."

No error resulted in the procedure so complained of by the appellant in this instance.

█ Counsel for appellant contends that the lower court erred in sustaining the state's objection to a question propounded to the witness Handley on cross examination as to whether he had been convicted of petty larceny. In this regard the record shows the following:

"Q. Have you ever been convicted of petty larceny?

"A. I don't know.

"Mr. Riley: We object.

"The Court: Sustained."

The cross examination of Handley by appellant's attorney then continued as to other matters unassociated with any prior conviction or convictions.

No reversal can be cast as a result of the above ruling for two reasons.

First, the objection was not interposed until after answer had been made.

Second, the question was faulty in form in that it is too broad.

█ Petit larceny is a crime involving moral turpitude. Hutchens v. State, 207 Ala. 126, 92 So. 409; Payne v. State, 261 Ala. 397, 74 So.2d 630. The general rule is that a witness may be examined as to his conviction of crimes involving moral turpitude, such evidence going to his credibility. Section 434, Title 7, Code of Alabama 1940.

However, it has been consistently held that Section 434, supra, and its progenitors, contemplates only convictions for violations of state laws, and not municipal ordinances. Thus where the question concerning convictions for misdemeanors does not make clear that the conviction was for violation of state laws, a court will not be put in error for sustaining an objection to the question. See McElroy, Law of Evidence in Alabama, Vol. 1, Sec. 145.01(5) for a full discussion of this principle with apt citation of authorities.

Counsel for appellant strenuously argues that error resulted from an allegedly false answer given by one of the jurors in response to a question propounded to the jurors by the District Attorney. Since it is our conclusion that this judgment is due to be reversed, such point is not likely to arise in event of another trial and no useful purpose would be served by writing to it.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.